[Civil No. 3869.   Filed October 18, 1937.]

[72 Pac. (2d) 580.]

CITY OF PHOENIX, a Municipal Corporation of the State of Arizona; R. W. HUSSONG, Health Officer of the City of Phoenix; M. B. MORRISON, Chief of Police of the City of Phoenix; and I. A. JENNINGS, City Attorney of the City of Phoenix, Appellants, v. Mrs. C. W. BREUNINGER and W. A. BARRY, Appellees.

Mr. I. A. Jennings, City Attorney, and Mr. Hess Seaman, his Assistant, for Appellants.

Mr. John C. Lee, for Appellees.

LOCKWOOD, J.—On the 4th day of August, 1936, the City of Phoenix adopted Ordinance No. 2375, being one regulating the sale of milk and milk products within the City of Phoenix. Said ordinance contained among other things, section 8, which reads:

"Grades of Milk and Milk Products Which May be Sold. From and after the date on which this ordinance takes effect no milk or milk products shall be sold or disposed of to the final consumer or to a restaurant, soda fountain, grocery store, or similar establishment, except grade A pasteurized milk and/or certified milk that has been pasteurized or milk products that result in the process of manufacturing milk products."

It will be seen from the section that it, in effect, prohibits the distribution of any except pasteurized milk within the City of Phoenix.

W. A. Barry, who is a dairyman duly licensed by the state of Arizona to produce and distribute raw milk under the provisions of chapter 82, Session Laws

of 1931, and Mrs. C. W. Breuninger, who is a citizen of Phoenix residing at 327 Laurel Avenue within said city, brought suit against the city and its health officer, chief of police and city attorney, claiming that the ordinance in question, and particularly section 8 thereof, was unconstitutional under the Fourteenth Amendment of the Constitution of the United States, and article 2, sections 4 and 13, of the Constitution of the State of Arizona, and chapter 82, Session Laws of 1931. The prayer was that the defendants be enjoined from enforcing said ordinance; that the court declare it unconstitutional, invalid, and void; and that a declaratory judgment be entered declaring the right to the plaintiffs and those similarly situated.

The defendants appeared, demurring on the ground that neither of the plaintiffs had legal capacity to sue; that there was a defect of parties plaintiff; and that the amended complaint did not state facts to constitute a cause of action. The court overruled the demurrer, and, defendants having stated that they elected to stand upon the demurrer, the court rendered judgment that Ordinance No. 2375 was void and of no effect, and that the defendants be enjoined from enforcing it, whereupon this appeal was taken.

There are two questions raised by the demurrer, the first being the procedural one of whether plaintiffs had the right to maintain an action of this nature, and the second the substantive one of whether the City of Phoenix had the constitutional right to adopt the ordinance, and particularly section 8 thereof.

Defendants have stated that, while they believe the judgment should be set aside upon the procedural question, both they and plaintiffs are desirous of obtaining a judicial determination of the validity of the ordinance, and particularly section 8 thereof, and would prefer a decision upon the merits.

We are of the opinion, after examining the entire record and considering it, that our decision can and should be based on the merits and, therefore, we do not consider nor discuss the procedural question involved, as it is unnecessary.

The contention of plaintiffs in regard to the invalidity of the ordinance is twofold: (a) That by chapter 82, Session Laws of 1931, the legislature had preempted and exclusively appropriated the field of milk legislation so as to prohibit even the home rule cities, such as Phoenix, from legislating further upon that subject; and (b) that, even if such were not the case, the ordinance was unconstitutional as in violation of Amendment 14 of the federal Constitution, and sections 4 and 13 of article 2 of the Constitution of Arizona. We consider the first contention. On examining the chapter above referred to, we find it to be entitled:

"An Act relating to dairies and dairy products, and creating the office of dairy commissioner," and that it is a very complete code relating to the distribution and sale of dairy products within the state of Arizona. Under it no person may distribute dairy products without a license to do so, and the standard to which such products must conform is set forth in the chapter. We find, however, that there are three places in the chapter which clearly recognize that some, at least, of the municipalities of the state had already attempted to legislate upon the same subject, and impliedly, if not expressly, approving of such legislation and permitting it to continue in effect, notwithstanding the provisions of the chapter. These three provisions are subdivision (f) of section 1, sections 5 and 14 of the act, which read, in part, as follows:

"Section 1. *Definition of Terms.* . . . (f) the United States public health service standard milk ordinance

herein referred to shall mean that particular United States public health service standard milk ordinance as passed and adopted by the commission of the city of Phoenix, the twenty-fifth day of April, 1928, and designated as ordinance No. 1087.''

''Section 5. *Producer's Permit.* No person shall produce market milk without permit to do so. Any person holding a permit from any municipality operating under the standard milk ordinance of the U. S. bureau of public health shall be deemed as having sufficient permit for the requirements of this act.''

''Section 14. *Designating Market Milk by Grade.* . . . In all cases where the requirements of such standard ordinance shall exceed or equal those of the state dairy law such ordinance requirements shall be in effect within the jurisdiction of such communities as shall be operating under such ordinance. In all cases where the requirements of such state law shall exceed those of such standard ordinance such state law shall be in effect.''

It is clear from reading these sections that the legislature recognized the existence of a certain milk ordinance of the City of Phoenix; and that the city was issuing permits under said ordinance, and expressly approved thereof. Section 14 particularly implies that a municipality might desire to impose more rigid terms on the distribution of milk than those imposed by the state, and that, if it did so, the provisions of the ordinance, rather than the state law, would govern, but, if the city established a milk code less exacting in its terms than that of chapter 82, *supra,* the latter takes precedence. In other words, the legislature said to the city, in effect, ''you may do *more* than the state in regard to regulating the distribution of milk products, but you may not do *less.*''

Section 2 of Chapter 4, subdivision 23, of the Charter of the City of Phoenix, confers the following powers on the city:

"To provide for and regulate the inspection of meats, poultry, fish, game, butter, cheese, lard, eggs, vegetables, breadstuffs, milk and other food products offered for sale in the city; to provide for the taking and summarily destroying of such products as are unsound, spoiled, adulterated or unwholesome; to regulate and prevent the bringing into the city or having or keeping within the city of any such spoiled, unsound, adulterated or unwholesome products."

We think this is a definite and specific grant to the city of the right to regulate the sale of milk within the city, and to prevent bringing into it any spoiled, unsound, adulterated, or unwholesome milk.

■■ This court, in the case of *Clayton* v. *State,* 38 Ariz. 135, 297 Pac. 1037; Id., 38 Ariz. 466, 300 Pac. 1010, had before it the question of to what extent the municipalities of this state could legislate upon a subject which had been covered by the legislature. Therein we said:

"Where the subject is one of local interest or concern, *or where though not of local concern the charter or legislation confers on the city express power to legislate thereon, both jurisdictions may legislate on the same subject.* Where, however, the subject is of statewide concern, and the Legislature has appropriated the field and declared the rule, its declaration is binding throughout the state." (Italics ours.)

We have reaffirmed this principle in *American-La France & Foamite Corp.* v. *Phoenix,* 47 Ariz. 133, 54 Pac. (2d) 258, *Northeast Rapid Transit Co.* v. *Phoenix,* 41 Ariz. 71, 15 Pac. (2d) 951, and *State* v. *Jaastad,* 43 Ariz. 458, 32 Pac. (2d) 799.

Since the City of Phoenix had the express charter power to regulate the sale of milk within the city, we think, under the authority of the cases above cited, it had concurrent power with the state to legislate upon the subject, provided, always, of course, that such legislation did not contradict some rule laid down

by the state. This principle was recognized by the legislature when it implied, in chapter 82, *supra,* that a city might make *more* stringent regulations than the said chapter but could not make *less.* Nothing within the state law, either directly or by implication, prohibits cities from limiting the sale of milk therein to its pasteurized form. We hold, therefore, that so far as proposition (a) is concerned, Ordinance No. 2375 of the City of Phoenix (and particularly section 8 thereof) not being in conflict with chapter 82, *supra,* but merely imposing stricter regulations upon the sale of milk products within the City of Phoenix than did the said chapter, does not violate the rule laid down in the Clayton case.

We consider next the question whether the ordinance is in conflict with any of the provisions of the federal or state Constitution. Those provisions, which it is claimed the ordinance violates, read as follows:

"Article 14. [Amendment to Constitution of United States] . . . nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

"Section 4. [Constitution of Arizona]. No person shall be deprived of life, liberty, or property without due process of law."

"Section 13. [Constitution of Arizona]. No law shall be enacted granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations."

The argument of the plaintiffs on this point may be summed up as follows: "It is not a reasonable health regulation to forbid the sale of any except pasteurized milk within a municipality." In the case of *Gardenhire* v. *State,* 26 Ariz. 14, 221 Pac. 228, 230, we

had under consideration the general question as to how far a city might go in regulating the sale and disposition of milk and its products, and quoted approvingly the following language from a note in 18 A. L. R. 236, to *Cofman* v. *Ousterhous,* 40 N. D. 390, 168 N. W. 826:

" 'But the fact is that there is scarcely an exception to the rule that the courts will sustain, as a police measure, practically every regulation which is said by the health board to be necessary to the protection of milk as food. Therefore, the decisions uphold not only the regulations for the licensing of dealers, the inspection of cattle, the surroundings in which they are kept, the cleansing of utensils, and provisions against adulteration, but they sustain also the tuberculin test for cattle, and a blood test for peddlers, and have even sustained a regulation requiring dealers to give bond to pay for milk purchased.' "

██ The question of whether the sale of milk could be limited to its pasteurized form was not directly involved in the case just discussed, nor in any case heretofore considered in Arizona, but there is ample authority from other states upon that point. It is a well-known fact that milk is a product easily infected with bacterial life and that it is one of the commonest sources of many of the most dangerous diseases. The vast majority of cases of typhoid fever originate either in an impure water or milk supply. Malta fever is generally recognized as coming almost exclusively from infected milk, and such milk is one of the commonest carriers of diphtheria. The danger from milk containing tubercle bacilli is so well known that almost every state where the dairy industry is of any considerable importance provides for a rigid inspection to discover and destroy tubercular dairy cows. Such being the case, one of the most important duties of the health department of any municipal corpora-

tion is to insure that milk products distributed within the municipality are as free as possible from all such organisms. Since the famous discovery of Louis Pasteur, it has been a matter of common scientific knowledge that the process usually called pasteurization was almost certain to destroy any of the many forms of dangerous bacteria which from time to time infect milk, without seriously affecting its value as a food, and this is so generally accepted that courts may take judicial notice of the fact. *Pfeffer* v. *City of Milwaukee,* 171 Wis. 514, 177 N. W. 850, 10 A. L. R. 128; *Stephens* v. *Oklahoma City,* 150 Okl. 199, 1 Pac. (2d) 367. In the case of *Witt* v. *Klimm,* 97 Cal. App. 131, 274 Pac. 1039, the Pure Milk Law of California (Stats. 1927, p. 1944) was very similar in its provisions to chapter 82, *supra,* and did not limit the sale of milk to its pasteurized form. The city of San Francisco by ordinance not only limited milk sold in San Francisco to that class, but provided that the pasteurization must be performed within the city. The court quoted approvingly from the case of *Koy* v. *Chicago,* 263 Ill. 122, 123, 104 N. E. 1104, 1107, Ann. Cas. 1915C 67, which held valid an ordinance of the City of Chicago requiring the pasteurization of all milk for human consumption, and that pasteurization plants be equipped in a certain way, in the following language:

"There is no article of food in more general use than milk; none whose impurity or unwholesomeness may more quickly, more widely, and more seriously affect the health of those who use it. The regulation of its sale is an imperative duty which has been universally recognized. This regulation in minute detail is essential, and extends from the health and keeping of the cows which produce the milk, through all the processes of transportation, preservation and delivery to the consumer. Not only may laws and ordinances require that milk offered for sale shall be pure, wholesome, and free from the bacilli of any disease, but

they may and do, in order to produce this result, prescribe the manner in which such purity, wholesomeness, and freedom from disease shall be secured and made to appear. The cows may be required to be registered with a designated public authority; the dairies to be conducted and managed according to prescribed regulations, and, together with the dairy utensils, subjected to inspection; the receptacles in which milk is contained to be of prescribed character and capacity; the labels to be placed according to fixed regulations, and to contain certain required information; the milk to be prepared in the manner, at the times, and by the means directed, and at all times to be subject to inspection. These may be drastic restrictions upon a private business; but experience and the increasing knowledge of the causes of disease and the agencies of its propagation have demonstrated the necessity of such restrictions to the preservation of the public health. The object of all such restrictions is the preservation of the public health, and as a means to that end the protection of the general public against dishonest vendors of milk. They all impose inconveniences and expense upon the dealers in milk; but they are not on that account unreasonable, unjust, or oppressive. Legislatures and city councils, in the exercise of the police power, may prohibit all things hurtful to the health and safety of society even though the prohibition invade the right of liberty or property of an individual.''

Both the San Francisco and Chicago ordinances, it will be seen, were far more strict than that of the City of Phoenix ordinance, and yet they were sustained. We could cite many other cases to the same effect, but it is unnecessary.

We are of the opinion that both on reason and authority the limiting of the sale of milk to its pasteurized form is a regulation well within the discretion of the authorities of the City of Phoenix, and that the ordinance in question is a constitutional and valid one so far as that feature is concerned.

Since this part of the ordinance is the only one whose constitutionality was attacked, the judgment of the superior court of Maricopa county is reversed, and the cause remanded, with instructions to sustain defendants' demurrer to the complaint.

McALISTER, C. J., and ROSS, J., concur.